IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

FRED KIRKPATRICK, JR.              )
                                   )
v.                                 )    No. 2:05-0030
                                   )    Judge Nixon/Brown
JO ANNE B. BARNHART, Commissioner  )
of Social Security                 )


To:  The Honorable John T. Nixon, Senior Judge


### REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C.
§405(g), to obtain judicial review of the final decision of the
Commissioner of Social Security denying plaintiff disability
insurance benefits ("DIB") and supplemental security income
("SSI"), as provided under Titles II and XVI of the Social
Security Act ("the Act"), as amended.  The case is currently
pending on plaintiff's motion for judgment on the administrative
record (Docket Entry No. 10), to which defendant has responded
(Docket Entry No. 13).  For the reasons stated below, the
Magistrate Judge recommends that plaintiff's motion for judgment
on the administrative record be **GRANTED**, and that the decision of
the Commissioner be **REVERSED** and the cause **REMANDED** for further
proceedings consistent with this report, to include
supplementation of the record, rehearing, and the issuance of a
new decision.

1

## I. INTRODUCTION

Plaintiff filed his applications for DIB and SSI on March 14, 2001 (Tr. 60-62, 191-93). He alleged that he became unable to work on January 1, 1994, due to stiff joints, gout, arthritis, and mental problems (Tr. 84). His applications were denied at the initial and reconsideration stages of agency review (Tr. 29-31, 32-35, 194-97, 203-05). He then requested and received a hearing before an Administrative Law Judge ("ALJ"), which was held on May 22, 2003, and at which plaintiff was represented by counsel (Tr. 212-248). On October 15, 2003, the ALJ issued a decision finding plaintiff not disabled and denying his applications for benefits (Tr. 11-21). The ALJ made the following findings:

1. The claimant met the insured status requirements of the Act through March 31, 1999.

2. The claimant has not engaged in substantial gainful activity since the alleged onset of disability, January 1, 1994.

3. The claimant has a combination of impairments considered to be "severe" that includes gout, osteoarthritis, a hearing loss, borderline intellectual functioning and an affective disorder.

4. This combination of impairments does not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5. The claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision.

6. The claimant has the residual functional capacity to perform light work activity (walk and/or stand for six

2

out of eight hours and sit for six out of eight hours) which accommodates a sixth grade reading level; a third grade mathematics level; no frequent handling; no climbing of ladders, ropes and scaffolds; occasional climbing of stairs and ramps; occasional balancing, stooping, bending, kneeling, crouching and crawling; the avoidance of temperature extremes; and a decreased hearing ability in the left ear. There are moderate mental limitations in the ability to understand, remember and carry out detailed instructions; maintain attention and concentration for extended periods of time; deal with the general public; adapt to changes in the work environment; complete a normal workday without interruptions by psychological symptoms; and perform at a consistent pace without unreasonable breaks.

7.  The claimant is unable to perform any of his past relevant work.

8.  The claimant is 53 years old and was 43 years old as of his alleged disability onset date.

9.  The claimant has a seventh grade education.

10. The claimant has no transferable skills.

11. Based on VE testimony and considering the claimant's age, education, work experience and residual functional capacity, there are a significant number of jobs in the national economy that he could perform; therefore, using Medical-Vocational Rules 202.11 and 202.18 as a framework for decision-making, a finding of "not disabled" is appropriate.

12. The claimant has been "not disabled," as defined in the Act, since January 1, 1994.

(Tr. 20-21).

On February 11, 2005, the Appeals Council denied plaintiff's request for review of the decision of the ALJ (Tr. 5-7), thereby rendering that decision the final decision of the Commissioner. This civil action was thereafter timely filed, and the Court has jurisdiction. 42 U.S.C. § 405(g). If the

3

Commissioner's findings are supported by substantial evidence, based on the record as a whole, then these findings are conclusive.  Id.

## II.  REVIEW OF THE RECORD

### A.  Medical Evidence

#### 1.  Physical

The record indicates that plaintiff's primary care physician is Dr. Rhody (Tr. 98-106, 148-151).  Dr. Rhody's notes indicate that plaintiff was treated on April 22, 1993, for gouty arthritis (Tr.101).  Plaintiff had edema and swollen ankle joints.  Id.  He was to continue with his medications and follow up as needed.  Id.  There are no treatment records for the rest of 1993, any of 1994 or 1995.

In 1996, plaintiff was seen on September 9, for arthritis, new onset of hypertension, and muscle strain in his back (Tr. 101).  Plaintiff complained of a swollen left leg, joint pain and edema in the wrist.  Id.  Laboratory testing conducted at the same time, showed high values for uric acid, SGPT (ALT), cholesterol, triglycerides, and reactive protein (Tr. 102-103).

In 1997, plaintiff was seen one time in August, after he stepped on a nail (Tr. 100).  He was next treated on March 2, 1998 (Tr. 100).  Plaintiff complained of gout in his hands,

4

knees, and ankles and asked for a refill of his prescription. Id. On exam, his left knee and wrist were swollen and warm. Id. Lab results showed a normal uric acid rate but a high sedimentation rate (Tr. 105, 106). At a follow up visit on March 16, 1998, plaintiff reported that he was doing well except for left knee pain and some joint swelling (Tr. 99). On exam, his hands and wrists were normal, his knees had full range of motion but his left knee had mild crepitus of the patella. Id. He was diagnosed with gouty arthritis, rule out rheumatoid arthritis and continued on medication. Id. Additional laboratory testing conducted on March 16, 1998, showed normal values for plaintiff's uric acid, sedimentation rate, rheumatoid factor, and anti-nuclear antibody rate (Tr. 104). Plaintiff was seen again on September 14, 1998, to follow up on an emergency room visit for complaints of pain in the center of his chest and heart burn (Tr. 99). Plaintiff was diagnosed with gastritis and given Mylanta. Id. There are no treatment notes for visits to Dr. Rhody for the rest of 1998, all of 1999, or 2000.

Plaintiff saw Dr. Rhody twice in 2001. First on January 22, 2001, for right knee pain (Tr. 98). On exam, his right knee was warm and had diffuse swelling. Id. Dr. Rhody found that plaintiff had mild arthritis changes in his right knee. Id. Plaintiff was currently taking no medications, so Dr. Rhody prescribed new medication. Id. Plaintiff was next seen on

5

September 24, 2001, for follow up on his medication change (Tr. 149).  Dr. Rhody noted that lab results showed that plaintiff had a high uric acid rate and he was given additional medication.  Id.  Plaintiff was seen only once in 2002 by Dr. Rhody, on September 19, for a complaint of right ankle pain (Tr. 148).  Examination showed that plaintiff had mild tenderness in his right ankle.  Id.  He was diagnosed with osteoarthritis in the right ankle, and a history of gout and given medication.  Id.

Plaintiff underwent a physical consultative examination on April 24, 2001, by Dr. Melvin Blevins (Tr. 107-114).  Plaintiff alleged that he was unable to work due to gout and inflammatory arthritis which caused pain and swelling in his wrists, ankles, hands and feet and cramps in both calves (Tr. 108).  Plaintiff was able to read and write (Tr. 107).  Plaintiff admitted to previous problems with alcohol abuse and stated that he quit drinking a year ago (Tr. 107-108).  Plaintiff denied anxiety, had never been treated for depression, and has had no suicide attempts (Tr. 109).  Plaintiff related that in 1995 his brother tried to kill him and he had to shoot him in self defense and that this has caused him depression over the years but it is slowly resolving.  Id.

On examination, plaintiff was in no acute distress, he was alert and oriented and had a normal gait.  Id.  There was degenerative arthritic changes in both knees, there were minimal

6

degenerative changes in both ankles. <u>Id.</u> Examination of the back showed some paralumbar tenderness, but the spinal configuration was grossly normal and there was no muscular spasm. <u>Id.</u> Deep tendon reflexes were mildly decreased in both lower extremities but sensation was intact and straight leg raising was negative (Tr. 110). Hand grips were markedly decreased bilaterally, but Tinel's sign was negative. <u>Id.</u> Testing showed normal range of motion in his hips, knees, neck, back, shoulders, and elbows (Tr. 113-114). Plaintiff had restricted range of motion in his ankles, wrists, and hands and fingers (Tr. 113). Dr. Blevins diagnosed progressive degenerative osteoarthritis, past history of alcohol abuse, past history of acute and recurrent gout, hypertension, status post gunshot wounds, decreased visual acuity, decreased hearing acuity, and depression (Tr. 112). Dr. Blevins opined that plaintiff could occasionally lift 20 pounds, stand less than 2 hours per day, and sit 6 hours per day. <u>Id.</u>

On May 14, 2001, Dr. Shannon Tilley, a State Agency medical consultant, reviewed plaintiff's records and determined that they showed that plaintiff was capable of lifting 50 pounds occasionally, 25 pounds frequently, could stand, walk or sit about 6 hours, was unlimited in his ability to push or pull, but had a limitation on frequent handling (gross manipulation) (Tr. 122-124).

## 2. <u>Mental</u>

On April 16, 2001, plaintiff underwent a mental evaluation by Mary Kay Mathews, licensed psychological examiner (LPE) and Harry Stuber, Ph.D, licensed psychologist (Tr. 115-119). Plaintiff reported that he was currently working on a farm for 10 hours a day, two to three days a week (Tr. 116, 117). Dr. Stuber and Ms. Mathews found there were no problems with plaintiff's memory or thinking, he had an appropriate affect, and was in a good mood. <u>Id.</u> Dr. Stuber and Ms. Mathews found that plaintiff reported symptoms and behaviors that meet the criteria for alcohol dependence. <u>Id.</u> He stated that he quit drinking on his own about 8 months ago but then admitted that he drank a beer about a week ago. <u>Id.</u> Plaintiff reported that he had "bad nerves" but was unable to describe what he meant by "bad nerves" or give examples of how this condition interfered with his ability to function. <u>Id.</u> Plaintiff had never received any kind of mental health treatment or help from a 12-step group to maintain his sobriety. <u>Id.</u> Plaintiff reported daily activities of cooking, cleaning, doing laundry, and shopping (Tr. 117). Plaintiff also enjoyed working in the garden and fishing, and he reported that he goes to church (Tr. 116, 117). Dr. Stuber and Ms. Mathews found that plaintiff could appropriately relate to others, either in public or private. <u>Id.</u> Plaintiff was given IQ testing and obtained a verbal score of 76, a performance score

8

of 70, and a full scale score of 71 (Tr. 118). These scores
placed plaintiff in the borderline range of intellectual
functioning. Id. Testing also revealed that plaintiff had a
sixth grade reading level, and a third grade math and spelling
level. Id. Based on this examination and the test results, Dr.
Stuber and Ms. Mathews found that plaintiff could handle simple
and/or more detailed work like procedures and instructions,
remember locations and carry out these instructions. Id.
Plaintiff could perform activities within a schedule, maintain
regular attendance, and be punctual. Id. Plaintiff could
sustain an ordinary routine without special supervision and could
maintain concentration. Id. Plaintiff would work in
coordination with or in proximity to others without being
distracted and could make simple work-related decisions. Id.
Plaintiff could complete a normal work day and work week without
interruptions and could perform at a consistent pace without an
unremarkable number and length of mental rest periods. Id.
Plaintiff had the ability to interact appropriately with the
general public and could ask simple questions and request
assistance. Id. Plaintiff could accept instructions and respond
appropriately to criticism from supervisors. Id. He had the
ability to get along with coworkers without distracting them or
exhibiting behavior extremes. Id. He could maintain socially
appropriate behavior and adhere to basic standards of neatness

9

and cleanliness. Id. He could respond appropriately to changes in the work setting and could be aware of normal hazards and take appropriate precautions. Id. He can travel in unfamiliar places and use public transportation. Id. Plaintiff can set realistic goals and make plans independently of others (Tr. 118-119). Plaintiff was diagnosed with alcohol dependence and borderline intellectual functioning (Tr. 119). He was given a global assessment of functioning (GAF) score of 75.[1] Id. Dr. Stuber and Ms. Mathews observed that if plaintiff could receive appropriate treatment for his alcohol dependence, it was possible that he might function at a higher level. Id.

On June 12, 2001, Dr. Bradley Williams, a State Agency mental health consultant, reviewed plaintiff's records and determined that they indicated that plaintiff did not meet the requirements of any mental listing located at 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 139, 141). In terms of functioning, Dr. Williams determined that the record indicated that plaintiff had no "marked" limitations, he was "not significantly limited" in 15 out of 20 areas, and he was moderately limited in the remaining 5 areas (the ability to understand, remember and carry out detailed instructions; to maintain attention and

---

[1]A score of 71-80 indicates a judgment that if symptoms are present, they are transient and expectable reactions to psychosocial stressors and there is no more than slight impairment in social, occupational, or school functioning. *See Diagnostic and Statistical Manual of Mental Disorders*, 32 (4th Ed. 1994).

10

concentration for extended periods; to complete a normal workweek without interruptions and to perform at a consistent pace without an unreasonable number and length of rest periods) (Tr. 143-144). Dr. Williams opined that alcohol dependence and borderline intelligence functioning were the reason for the few areas with moderate limitations, but concluded that plaintiff retained the ability to understand and carry out simple tasks while getting along with others and adapting at that level of functioning (Tr. 145).

The record indicates that plaintiff began treatment with the Tennessee Clinically Related Group (CRG) in August 2001 (Tr. 158-160). Notes indicate that he sought a referral because he had applied for disability and his lawyer thought it would help his case if he had a psychiatric evaluation (Tr. 187). Plaintiff reported symptoms of nervousness and problems sleeping. Id. He said that although he worked occasionally in tobacco, his anxiety prevented him from being able to hold down a full time job (Tr. 187, 188). Plaintiff's speech was normal, he was fully oriented, he had appropriate affect and behavior, he had fair memory and concentration, good insight and judgement, normal thought content, dysphoric mood, and tangential thought flow (Tr. 189). Plaintiff's initial assessment indicated that at his lowest level of functioning in the past six months, plaintiff needed moderate assistance with daily activities, had moderate

11

problems with focus/ concentration and with change and had mild problems with interpersonal functioning (Tr. 158-159). Plaintiff was diagnosed with anxiety disorder, NOS (Tr. 188).  Notes from December 2001 indicate that plaintiff had moderate problems with insomnia, and depressed mood, anxiety, and somatization (Tr. 176).  Paxil helped him sleep and he subjectively felt a little better but he complained of headaches.  Id.  In January 2002, his sinus headaches were improved, but his arthritis was worse with a weight gain (Tr. 174).  His mood was moderate and his anxiety was minimal.  Id.  His mood had improved on medication but he continued to report episodes of depression, his concentration was o.k., he was still experiencing sleep problems.  Id.

In July 2002, CRG notes indicated that plaintiff had no problems with activities of daily living, and only mild problems with interpersonal functioning, concentration, task performance and pace, and adaptation to change (Tr. 161-162).  Plaintiff denied an current mood or thought disorder, had minimal anxiety, insomnia, or depression (Tr. 172).  In January 2003, CRG notes indicate that he had a moderate limitation in interpersonal functioning because he lived alone and liked being alone, but he had only mild limitations on the areas of: activities of daily living, concentration, task performance, and pace, and adaptation to change (Tr. 164-165).  Notes from May 2003 indicate that he had moderate levels of: joint pain, anxiety, and insomnia (Tr.

167). Plaintiff reported that he quit his medication because it gave him weird dreams. Id. He wanted to lose weight and reported that he works outside, has a garden, cans tomatoes, and lives by himself. Id. He was started on Zoloft. Id.

## B. Testimonial Evidence

At the administrative hearing, plaintiff testified that the last time he had a bad episode of gout was two years ago (Tr. 222). He got a cortisone shot and in three or four days he was better. Id. He takes pain medication for arthritis in his ankles, and in his hands and arms and it eases his pain (Tr. 222-223). He did not think he had much of a grip but he stated that he still could lift 20 pounds (Tr. 223). He said he had "nerve problems" which cause him to have trouble sleeping at night (Tr. 223-224). However, he also acknowledged that the mental health center gave him medication and his sleep has improved (Tr. 224). He socializes with people and goes fishing every two or three months. Id. He lives alone and can sweep the floor, wash the dishes, do laundry, cook, and work in his garden (Tr. 224-225, 226). He can walk a quarter mile to his mail box and back (Tr. 230). He does odd jobs like repairing fencing and cutting brush on a farm (Tr. 221, 231). He lost his driver's license due to a DUI in 2001 (Tr. 225). He can shop but needs a ride since he has no license (Tr. 228). He estimated that he could lift no more than thirty pounds, walk for two hours, stand

13

for 20 minutes, and sit for 30 minutes (Tr. 227, 230).

A vocational expert (VE) testified at the administrative hearing. The ALJ asked the VE to consider a person of plaintiff's age, education, past work experience with a residual functional capacity (RFC) for light work activity which accommodates a sixth grade reading level and a third grade math level; no frequent handling; no climbing of ladders, ropes, or scaffolding; occasional climbing of stairs and ramps; occasional balancing, stooping, bending, kneeling, crouching, and crawling; the avoidance of temperature extremes; decreased hearing in the left ear; moderate mental limitations in the ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods of time; deal with the public; adapt to change; complete a normal work day without interruptions by psychological symptoms and perform at a consistent pace without unreasonable breaks (Tr. 239-240). The VE testified that such a person would be capable of making an adjustment to three jobs: night watchman (35,000 jobs nationally), ticket taker (50,000 jobs nationally), and usher (35,000 jobs nationally) (Tr. 241).

### III. CONCLUSIONS OF LAW

#### A. Standard of Review

This Court's review of the Commissioner's decision is

14

limited to the record made in the administrative hearing process. Jones v. Secretary, 945 F.2d 1365, 1369 (6th Cir. 1991). The purpose of this review is to determine (1) whether substantial evidence exists in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision. Landsaw v. Secretary, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion." Her v. Commissioner, 203 F.3d 388, 389 (6th Cir. 1999)(citing Richardson v. Perales, 402 U.S. 389, 401 (1971)). It has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance." Bell v. Commissioner, 105 F.3d 244, 245 (6th Cir. 1996). Even if the evidence could also support a different conclusion, the decision of the ALJ must stand if substantial evidence supports the conclusion reached. Her, 203 F.3d at 389 (citing Key v. Callahan, 109 F.3d 270, 273 (6th Cir. 1997)). However, if the record was not considered as a whole, the Commissioner's conclusion is undermined. Hurst v. Secretary, 753 F.2d 517, 519 (6th Cir. 1985).

B.   Proceedings at the Administrative Level

The claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any

15

medically determinable physical or mental impairment which can be
expected to result in death or which has lasted or can be
expected to last for a continuous period of not less than 12
months." 42 U.S.C. § 423(d)(1)(A). At the administrative level
of review, the claimant's case is considered under a five-step
sequential evaluation process, as follows:

(1) If the claimant is working and the work constitutes
    substantial gainful activity, benefits are automatically
    denied.
(2) If the claimant is not found to have an impairment which
    significantly limits his or her ability to work (a "severe"
    impairment), then he or she is not disabled.
(3) If the claimant is not working and has a severe impairment,
    it must be determined whether he or she suffers from one of
    the "listed" impairments[2] or its equivalent; if a listing is
    met or equaled, benefits are owing without further inquiry.
(4) If the claimant does not suffer from any listing-level
    impairments, it must be determined whether the claimant can
    return to the job he or she previously held in light of his
    or her residual functional capacity (e.g., what the claimant
    can still do despite his or her limitations); by showing a
    medical condition that prevents him or her from returning to
    such past relevant work, the claimant establishes a <u>prima
    facie</u> case of disability.
(5) Once the claimant establishes a <u>prima facie</u> case of
    disability, it becomes the Commissioner's burden to
    establish the claimant's ability to work by proving the
    existence of a significant number of jobs in the national
    economy which the claimant could perform, given his or her
    age, experience, education, and residual functional
    capacity.

<u>Moon v. Sullivan</u>, 923 F.2d 1175, 1181 (6th Cir. 1990).

    The Commissioner's burden at the fifth step of the
evaluation process can be carried by relying on the medical-

_____

[2]The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P,
Appendix 1.

16

vocational guidelines, otherwise known as "the grid," but only if
the claimant is not significantly limited by a nonexertional
impairment, and then only when the claimant's characteristics
identically match the characteristics of the applicable grid
rule. Otherwise, the grid can not be used to direct a
conclusion, but only as a guide to the disability determination.
Id. In such cases where the grids do not direct a conclusion as
to the claimant's disability, the Commissioner must rebut the
claimant's prima facie case by coming forward with particularized
proof of the claimant's individual vocational qualifications to
perform specific jobs, which is typically obtained through
vocational expert (VE) testimony. See Varley v. Secretary, 820
F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity (RFC) for
purposes of the analysis required at steps four and five above,
the Commissioner is required to consider the combined effect of
all the claimant's impairments, mental and physical, exertional
and nonexertional, severe and nonsevere. See 42 U.S.C. §
423(d)(2)(B).

C. Plaintiff's Statement of Errors

Plaintiff first argues that he meets the listing for
mild mental retardation, § 12.05(C). The listing criteria are as
follows:

12.05 Mental retardation: Mental retardation refers to
significantly subaverage general intellectual

17

functioning with deficits in adaptive functioning
initially manifested during the developmental period;
i.e., the evidence demonstrates or supports onset of
the impairment before age 22.
     The required level of severity for this disorder
is met when the requirements in A, B, C, or D are
satisfied.
     ...
     C.  A valid verbal, performance, of full scale IQ
of 60 through 70 and a physical or other mental
impairment imposing an additional and significant work-
related limitation of function;

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05.

While plaintiff clearly satisfies the IQ and additional

severe impairment criteria of this listing, the record does not

reveal the required deficits in adaptive functioning or early

onset of impairment which are the hallmarks of mild mental

retardation versus borderline intellectual functioning.  To begin

with, the consulting psychologist who obtained plaintiff's

qualifying IQ scores gave the diagnosis of borderline

intellectual functioning, not mild mental retardation, and the

balance of his medical assessment supports this diagnosis (Tr.

118-19).  While the ALJ assigned a limitation of moderate

impairment in the ability to adapt to change in a work setting,

apparently based on the initial CRG assessment in August 2001

(Tr. 159), the balance of the psychological evidence of record

indicates that his ability to adapt to changes in a work setting

is only mildly impaired if at all (Tr. 118, 144, 162, 165).

Furthermore, as the ALJ noted, plaintiff's past relevant work has

18

included jobs that are at least semiskilled, casting doubt on his claimed level of functioning. Cf. Foster v. Halter, 279 F.3d 348, 355 (6th Cir. 2001); Daniels v. Comm'r of Soc. Sec., 89 Soc. Sec. Rep. Serv. 232, 2003 WL 21774004, at **5 (6th Cir. July 30, 2003)(unpublished opinion).

Finally, despite plaintiff's claim that his sixth grade reading level and requirement for special education classes in the Michigan school system demonstrate the onset of impairment prior to age 22, the ALJ pointed out that plaintiff only attended school through the seventh grade, making his sixth grade reading level an unreliable indicator of his intellectual limitation. It further appears that plaintiff did not require special education through the fifth grade while in the Tennessee school system, and evidently neither the Tennessee school nor the Michigan school where he attended sixth and seventh grade ordered an intelligence test. While the record was held open for further documentation from the Michigan school system (Tr. 215-16), no documents were in fact submitted. The Sixth Circuit has "generally require[d] a claimant to meet this [early onset] requirement through more definite means, such as providing the Commissioner with scores from a test taken prior to the age of 22 or conclusions from an evaluation performed before Plaintiff had turned 22 . . ." Daniels, 2003 WL 21774004, at **6 (citing Foster, 279 F.3d at 354-55). In sum, plaintiff has not proved that his intellectual

19

limitation meets or equals the criteria of listing 12.05(C).

Plaintiff next argues that the ALJ erred in rejecting Dr. Blevins' assessment of his ability to stand/walk, noting that the VE identified only sedentary jobs when questioned about Dr. Blevins' assessment (Tr. 246-47). Plaintiff further notes that Dr. Blevins, a consultant hired by the Social Security Administration, was the only examining physician to assess plaintiff's residual functional capacity.[3] While the ALJ's decision to give greater weight to the opinion of a nonexamining state agency physician than to the opinion of an examining consultant is questionable as a matter of pure medical evidence review, that decision is nonetheless substantially supported (at least with respect to plaintiff's DIB application) by the ALJ's reference to plaintiff's robust activities and work attempts, the latter of which notably included working (while presumably standing/walking a great deal) on a farm for ten hours a day, two to three days a week as late as April 2001 (Tr. 116). While plaintiff testified that by 2003 he was limited to working on a farm "only about two hours a day ... because I couldn't stand up all that long at one time" (Tr. 221), the undersigned finds no fault with the ALJ's finding of plaintiff's RFC as of his date last insured (March 31, 1999).

---

[3]Plaintiff's treating physician, Dr. Rhody, declined to submit a Medical Source Statement (Tr. 152-54).

With respect to plaintiff's condition during his insured period, the aforementioned proof of his ability to do sustained farm work two years post that period combines with the scant medical record during the period to support the conclusion that he remained capable of performing light work at least until his date last insured. Specifically, the record reveals no treatment with Dr. Rhody during 1994 or 1995, one visit in 1996 (Tr. 101-103), one visit in 1997 when he stepped on a nail (Tr. 100), three visits in 1998 (one of which was to followup on a complaint of chest pain and heart burn) (Tr. 99-100, 104), and no visits in 1999. Thus, the undersigned would not disturb the ALJ's finding of plaintiff's RFC for purposes of the period prior to March 31, 1999. However, in light of the error identified below, and the progressive nature of plaintiff's arthritic limitations, the Commissioner should have both the opportunity and the benefit of an updated medical record to revisit the issue of plaintiff's RFC (for purposes of his application for supplemental security income) in more recent years.

Despite plaintiff's argument regarding the ALJ's finding of his RFC, it was in fact determined that his RFC was sufficiently diminished to preclude his past relevant work, and the burden therefore shifted to the Commissioner to prove the existence of a significant number of jobs which plaintiff remained capable of performing. Plaintiff's past relevant work

21

includes a job as a night watchman, performed in conjunction with his job as a boiler tender/operator.  Plaintiff testified that the performance of his night watchman duties required only that he walk the perimeter of the property and watch for signs of illegal entry (Tr. 218).  Nevertheless, the VE testified that "night watchman is considered to be light and semiskilled" (Tr. 238).[4]  While the ALJ considered the exertional requirements of this past relevant work to be within plaintiff's RFC, he found that "the night watchman job is beyond the [plaintiff's] concentration and attention abilities . . ." (Tr. 20).  Notably, the VE did not appear to agree with this assessment, as the following colloquy appears to demonstrate:

> ALJ: . . . With the limitations that I've provided, could claimant do any of his past relevant work?
>
> VE:  [INAUDIBLE] the night watchman that he did before, but none other.
>
> ALJ: I see.  He couldn't do the boiler tender?
>
> VE:  No.  I think it took too much concentration and attention.

(Tr. 240).

Following this exchange, the ALJ proceeded to ask whether other jobs accommodating the identified restrictions existed in the economy.  In response, the VE testified that no

---

[4]Presumably this is consistent with The Dictionary of Occupational Titles, which the VE cited as the basis for her testimony immediately preceding her characterization of the night watchman job (Tr. 238).

Case 2:05-cv-00030   Document 15   Filed 09/28/05   Page 22 of 26 PageID #: 47

jobs existed at the medium or sedentary exertional levels which would accommodate the restriction to no frequent handling, though she was able to identify three (and only three) light jobs suited to the hypothetical vocational profile:

> At the light level we do have some of the [INAUDIBLE] types of jobs like he performed in the past. Those are found in numbers of about 1,200 in our state economy and approximately 35,000 in the national economy. You have jobs such as ticket taker at the light level. Those would be found in numbers of about 400 in our state economy, approximately 50,000 in our national economy. We have jobs that are classified as usher. And those are found in numbers of about 600 in our state economy and approximately 35,000 in our national economy. And that's all I [INAUDIBLE] with only occasional handling.

(Tr. 241). Reading this testimony in conjunction with the ALJ's decision (Tr. 20), it appears that the first job the VE identified is the job of night watchman, which the VE identified as semiskilled (Tr. 238) and existing nationally "like he performed in the past" in numbers approximating 35,000, but which the ALJ found to be unskilled and existing nationally in numbers approximating 75,000 (Tr. 20). The ALJ further described the VE's testimony to 75,000 usher jobs, when the VE in fact testified to only 35,000 such jobs (Tr. 241).

With regard to the three jobs identified above and the night watchman job in particular, there are too many discrepancies and gaps between the VE's testimony and the ALJ's findings for the undersigned to deem any of it reliable. However, this is not the greatest of the undersigned's concerns

23

with the ALJ's step five finding.  The ALJ's finding of
plaintiff's RFC details the following work-related limitations:

> (1)  light exertion (walk and/or stand for six out of
>      eight hours and sit for six out of eight hours);
> (2)  sixth grade reading level and third grade
>      mathematics level;
> (3)  no frequent handling;
> (4)  no climbing of ladders, ropes, or scaffolds;
> (5)  occasional climbing of stairs and ramps;
> (6)  occasional balancing, stooping, bending, kneeling,
>      crouching and crawling;
> (7)  avoidance of temperature extremes;
> (8)  decreased hearing in the left ear;
> (9)  moderate mental limitations (i.e., understand,
>      remember and carry out detailed instructions;
>      maintain attention and concentration for extended
>      periods of time; deal with the general public;
>      adapt to changes in the work environment; complete
>      a normal workday without interruptions by
>      psychological symptoms; perform at a consistent
>      pace without unreasonable breaks).

(Tr. 21).  Of these nine limitations, only the first, second,
third, fourth, eighth, and ninth were incorporated into the
hypothetical that produced the VE testimony quoted above and
relied upon by the ALJ (Tr. 239-240).  The remaining limitations
were only incorporated into a second hypothetical which does not
appear to have included the handling limitation, nor perhaps any
of the other previously incorporated limitations (Tr. 245).  In
short, the ALJ's hypothetical questions to the VE did not include
all of the limitations which he found to be supported by the
record, and therefore the VE's testimony in response to these
questions does not constitute substantial evidence sufficient to
carry the Commissioner's step five burden.  See <u>Felisky v. Bowen</u>,

35 F.3d 1027, 1035-36 (6th Cir. 1994).  The undersigned concludes that the Commissioner's decision must be reversed and the cause remanded for further factfinding.

On remand, the Commissioner should reconsider, for SSI purposes, plaintiff's RFC upon the supplemented medical record. Plaintiff's arthritic condition is a degenerative one, and as plaintiff notes in his brief, if his ability to stand and walk has become limited to the point that he can only perform sedentary work, the grids would appear to direct a finding of disability.

## IV.  RECOMMENDATION

In light of the foregoing, the Magistrate Judge recommends that plaintiff's motion for judgment on the administrative record be **GRANTED**, and that the decision of the Commissioner be **REVERSED** and the cause **REMANDED** for further proceedings consistent with this report, to include supplementation of the record, rehearing, and the issuance of a new decision.

Any party has ten (10) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court.  Any party opposing said objections shall have ten (10) days from receipt of any objections filed in which to file any responses to said objections.  Failure to file

25

specific objections within ten (10) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. Thomas v. Arn, 474 U.S. 140 (1985); Cowherd v. Million, 380 F.3d 909, 912 (6th Cir. 2004)(en banc).

        **ENTERED** this 28th day of September, 2005.


      /s/ Joe B. Brown
      JOE B. BROWN
      United States Magistrate Judge